**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Phillip K Clayton, et al.,

                    Plaintiffs,

v.

Heil Company Incorporated,

                    Defendant.

No. CV-19-04724-PHX-GMS

**ORDER**

Before the Court are Heil Company Incorporated's Motion to Exclude Untimely Supplemental Expert Disclosures (Doc. 123), Supplemental Motion to Exclude Additional Untimely Expert Disclosures (Doc. 125), Motion to Exclude the Testimony of Wilson Hayes (Doc. 128), Motion to Exclude the Testimony of James Glancey (Doc. 129), Motion to Exclude the Testimony of Alison Vredenburgh (Doc. 130), and Motion for Summary Judgment (Doc. 131).  For the following reasons, the Motion for Summary Judgment is granted, the Motions to Exclude all experts' design defect opinions are granted, the Motion to Exclude Dr. Glancey's information defect opinion is granted, and the remaining motions are denied as moot.

## BACKGROUND

Plaintiffs Phillip Clayton, Sabrina Clayton, and Christina Clayton ("Plaintiffs") brought this strict products liability and negligence action against Defendant Heil Incorporated ("Defendant").  The case concerns an injury that Mr. Clayton sustained while

1   working in his capacity as a sanitation worker for the City of Scottsdale.

2   The product at issue is a rear-loader refuse truck manufactured by Heil, called a

3   DuraPack 5000.   The machine has hydraulically powered packer panels, which are

4   operated by controls.  The controls are located at the rear of the truck on the passenger side.

5   When the packer panels are in operation, they compact refuse in the opening at the rear of

6   the truck ("hopper") and sweep the refuse into the larger internal receptacle in the truck's

7   body.  Plaintiffs allege that the controls are on the side of the truck, 10 inches in front of

8   the truck's rear.  The side of the truck is 64.25 inches tall.  (Doc. 144 ¶ 6-8.)   This

9   configuration allows the person operating the panels to look into the hopper while they are

10   in operation.  (*Id*.)  The width of the hopper where refuse can be loaded is 80 inches.  (Doc.

11   132 ¶ 5.)  There is no guard on or around the hopper.  (Doc. 144 ¶ 9.)

12   Mr. Clayton was employed by the City of Scottsdale in the Brush Services

13   Department.  On May 23, 2018, he and his coworker Samuel Loburi were disposing of

14   monthly bulk waste in Scottsdale.  A tractor operator, Vince Ybarra, was also assigned to

15   the route to assist with picking up large items.  The crew was working in a cul-de-sac when

16   they observed landscapers piling branches for collection.  When the tractor driver, Mr.

17   Ybarra, went to the bathroom, Mr. Loburi began operating the tractor to pick up the

18   branches and load them into the hopper.  The parties dispute to what extent, if any, Mr.

19   Clayton operated the packer panels as Mr. Loburi loaded them into the hopper.  At some

20   point, however, as Mr. Loburi backed the tractor away from the hopper, a palo verde branch

21   ejected from the hopper and struck Mr. Clayton on the side of the head.  The parties also

22   dispute where exactly Mr. Clayton was standing when the branch was ejected.

23   Immediately after he was struck, Mr. Clayton fell and hit his head on the ground.

24   He began bleeding from his head, mouth, and nose, and shaking uncontrollably.  Mr.

25   Clayton suffered multiple skull fractures and was hospitalized for almost a year.  To date,

26   he requires round-the-clock care and significant assistance performing most tasks.

27   The branch that struck Mr. Clayton was approximately 12 or 13 feet long, and most

28   of the branches that Mr. Loburi loaded into the hopper were 10 to 12 feet long.  The

Scottsdale Safety Manual, on which Mr. Clayton was trained, warned operators to "stand to the side of the hopper to avoid the possibility of being hit by flying debris" and "watch out for objects protruding from the hopper or falling out." (Doc. 132 ¶¶ 11, 14.) Additionally, Scottsdale had a city ordinance against collecting material from commercial landscapers or branches longer than 6 feet.  Mr. Loburi was aware of the six-foot limitation and recognized that the branches he loaded into the hopper were too long.  (Doc. 132-1 at 31.)  Warnings placed on the truck near the controllers warn users to "stay clear" and "stand clear."  (Doc. 132-3 at 111-13.)  The operator's manual included warnings such as "stay clear at all times when container is off the ground" and "be sure all individuals are clear of the operating mechanism before actuating the controls."  (Doc. 143-3 at 15.)

On July 15, 2019, Plaintiffs filed their complaint, alleging counts of strict products liability and negligence under Arizona law.   Specifically, Plaintiffs allege that the DuraPack 5000 contained a design defect, manufacturing defect, or information defect, and that Heil was negligent because it knew or should have known of the defect.  Plaintiffs retained three experts to opine on the truck's design and warnings, and the cause of Mr. Clayton's injury.  At the close of discovery, Defendant moved to exclude Plaintiffs' expert rebuttal reports and supplemental disclosures on the basis that they were untimely and outside the scope of rebuttal.  Defendant also moved to exclude the expert opinions on *Daubert* grounds for lack of qualification, reliability, and relevance.  Lastly, Defendant moved for summary judgment on all counts.

## DISCUSSION

### I.  Motions to Exclude

Plaintiffs design defect claim is central to all other claims in this case.  Because the Court's analysis on the summary judgment motion depends in part on the outcome of the Motions to Exclude the experts' design defect opinions, the Court addresses the relevant motions to exclude first. Pursuant to Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Court acts as a gatekeeper to ensure the proffered testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). Expert opinion testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. When making this determination, the Court should consider (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017). However, these factors are not exhaustive, nor are they "equally applicable (or applicable at all) in every case." *Daubert*, 43 F.3d at 1317. "Applicability 'depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Murray*, 870 F.3d at 922 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Expert opinion must also be "relevant to the task at hand" and "logically advance[] material aspect of the proposing party's case." *Daubert*, 43 F.3d at 1315. "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997) (quoting *Daubert*, 43 F.3d at 1321 n.17)).

The Court is afforded broad discretion when acting in its gatekeeper role. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000); *Kumho Tire*, 526 U.S. at 150–53. However, "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick*

- 4 -

1  *v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S.

2  at 588).  "Shaky but admissible evidence is to be attacked by cross examination, contrary

3  evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d

4  558, 564 (9th Cir. 2010).

5  **A.  Dr. Glancey**

6     Defendant moves to exclude Dr. Glancey's testimony.  Dr. Glancey offers testimony

7  about design defects and warning defects associated with the DuraPack 5000.  Defendant

8  moves to exclude on the grounds that he is unqualified, the opinions are unreliable, and the

9  opinions will not aid the jury.

10     **1.  Design Defect**

11     Dr. Glancey's initial report identifies the purported design defect as "the chance for

12  flying debris emanating from the hopper that was not obvious to [Plaintiff], and was not

13  identified by [Defendant]."  (Doc. 129-1 at 147.)  He opines that Plaintiff "was in a

14  foreseeable position next to the hydraulic controls that allowed him to be struck-by fly[ing]

15  debris emanating from the hopper," and that Defendant failed to conduct an appropriate

16  Failure Modes and Effects Analysis ("FMEA") or other design analysis that would have

17  identified the defect.  (Doc. 129-1 at 147.)  Finally, he indicates that safer alternative

18  designs, in the form of guarding, existed at the time, and should have been used on the

19  DuraPack 5000.  (Doc. 129-1 at 148.)

20     In light of the inquiry required by *Daubert*, Dr. Glancey's opinions on design defects

21  are excluded because they are unreliable.  Plaintiffs have not provided any particular

22  methodology or approach that Dr. Glancey used to reach his conclusions.  To the contrary,

23  they state that he "looked at the design of this garbage truck" to formulate his opinions.

24  (Oral Arg. Tr. 13:18-19.)  They state that after he looked at the truck, he did "ordinary

25  engineering analysis" (Oral Arg. Tr. 13:13:24) but do not provide any further details into

26  what that analysis entailed.

27     According to Dr. Glancey's report, his opinion is "[t]he design defect was the

28  chance for flying debris emanating from the hopper that was not obvious to Mr. Clayton."

(Doc. 129-1 at 147.)  To be sure, there might be a basis for concluding that the ability for debris to escape out of the back of a trash-compacting truck could be a design flaw.  But, it is not self-evident, and it is not possible to arrive at such a conclusion absent an explanation as to why that is so.  *See* Fed. R. Evid. 702; *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) ("The question is whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'")  And Dr. Glancey provides no such explanation.  For example, Dr. Glancey does not demonstrate that trucks existed at the time of design from which debris could not escape out the back nor does he offer a proposed design alternative that allegedly eliminates the possibility that debris could escape the truck.  Without any further evidence that the mere possibility for debris to escape out the back is a design flaw, Dr. Glancey's opinion is unsupported by any reliable methodology.

Ultimately, Dr. Glancey's report offers little insight into why, beyond Plaintiff's injury itself, he believes the DuraPack 5000 was defectively designed.  While Dr. Glancey criticizes Defendant's engineers for failing to conduct an FMEA analysis that he argues would have highlighted the defective design, he admitted that any FMEA analysis that he conducted was "in my head" and never produced in writing.  (Doc. 129-1 at 44.)  Since no such test was produced in writing, the Court has no way of assessing its reliability.  And, since it was not disclosed in compliance with the requirements of the Court, it could not be admitted at trial in any event.  Additionally, Dr. Glancey did not test or conduct research on the key questions bearing on whether a design defect existed.  While Plaintiffs contend that the design of the DuraPack 5000 requires its operators to stand in a hazardous zone, Dr. Glancey did not define the parameters of this zone or conduct any testing that could identify the conditions under which objects are expelled from the DuraPack 5000 and where they would typically land.  Finally, Dr. Glancey appears to have drawn his proposed alternative designs from public internet searches; he admits that he did not test any of the alternative designs and had not concluded that any of the designs would have shielded

Plaintiff from injury in this case.  (Doc. 150 at 5.)  As a result, the first *Daubert* factor cuts against a finding of reliability.

As for peer review, Dr. Glancey offers no indication that his opinions about the design of the truck have been peer reviewed.  The Court's review of his CV reveals that he has never published on refuse truck design, and Dr. Glancey does not identify any peer-reviewed article on this topic that he used to inform his conclusions.  *But see Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or insufficiently broad interest, to be in the literature.")  Plaintiffs do not provide any reason why peer reviewed literature to form the basis of his opinion might be lacking.  Thus, absent any showing that Dr. Glancey's design defect and alternative design theories have been peer reviewed, the second *Daubert* factor likewise cuts against finding his opinions reliable.  *See Martinez v. Terex Corp.*, 241 F.R.D. 631, 638 (D. Ariz. 2007).  And, given that there are no published studies to support Dr. Glancey's theories, their error rate cannot be determined.  *Daubert*, 43 F.3d at 1316.

Further, Plaintiffs have not established that Dr. Glancey's opinions are generally accepted in the scientific community.  Defendant notes that Dr. Glancey's opinions run directly counter to the American National Standards Institute's ("ANSI") standard governing refuse trucks, which requires hopper controls on refuse trucks to be located on the side of the vehicle, positioned so that "the operator has a clear view of the point of operation."  (Doc. 132-3 at 118.)  Weighed alongside the lack of peer-reviewed scholarly work corroborating Dr. Glancey's theory, the Court concludes that this lack of support similarly cuts against reliability.

Consequently, as all relevant *Daubert* factors weigh against finding Dr. Glancey's opinions regarding design defect and safer alternative designs reliable, Plaintiffs have failed to show that Dr. Glancey's opinions in these areas are admissible under Rule 702.  Dr. Glancey's opinions on the design of the DuraPack 5000 and the availability of any safer alternative designs are excluded, and Defendant's motion is granted on this ground.

### 2.  Information Defect

Dr. Glancey's opinions about an information defect are also excluded. "The proponent of expert testimony has the ultimate burden of showing that the expert is qualified." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX-DGC, 2018 WL 775296, at *2 (D. Ariz. Feb. 8, 2018). Dr. Glancey is a mechanical engineer. Most of his teaching and writing has been about mechanical engineering, and his expert testimony pertains generally to questions of product design and product failure. (Doc. 129-1 at 180.) While Dr. Glancey testified that he is an expert in "warnings, related to mechanical equipment in machines," Plaintiffs do not identify any specific knowledge, skill, experience, or training that would qualify Dr. Glancey to offer such testimony. (Doc. 129-1 at 22); (Doc. 146 at 2 n.1.) Moreover, the Court is unable to ascertain any such qualifications from Dr. Glancey's CV, apart from his retention as an expert witness in a single case in 2018 where he provided "[a]nalysis of the frictional attributes, warnings, and injury associated with a McDonalds tile floor." (Doc. 129-1 at 179.) Therefore, while Dr. Glancey may be qualified to opine on issues relating to product design, his expertise in that field does not allow him to testify in the distinct field of warning design and placement. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."). Dr. Glancey is therefore not qualified to offer opinions on warnings in this case. Defendant's motion is granted on this ground.

### B. Dr. Vredenburgh

Defendant moves to exclude Dr. Vredenburgh's opinions in their entirety. In her report, Dr. Vredenburgh offers opinions in two general categories: design defects and information defects. Defendant offers three bases for excluding Dr. Vredenburgh's opinions: she is not qualified, she did not use a reliable methodology, and her testimony will not assist the jury. The Court addresses only Dr. Vredenburgh's design opinion.

1          **1.  Design Defect**

2          Because Dr. Vredenburgh has not demonstrated that her design defect opinions are

3  reliable, they are excluded.  In her report, Dr. Vredenburgh concludes that the DuraPack

4  5000 "forces the operator to be inches from the hazard, path of ejections, due to the

5  design/placement of the controls." (Doc. 130-1 at 5.)  As noted above, the inquiry under

6  Rule 702 involves evaluating whether the expert is qualified, whether the opinion is

7  reliable, and whether it will aid the trier of fact.  Fed. R. Evid. 702; *Daubert v. Merrell*

8  *Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).

9          Dr. Vredenburgh is not an expert in refuse trucks, but she does not purport to be

10  one.  Instead, Plaintiffs assert that she is a human factors expert, which is "an applied

11  science concerned with designing and arranging things people use so that the people and

12  things interact most efficiently and safely." *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011

13  WL 1673805, at *11 n.11 (E.D. Pa. May 4, 2011).  To support her qualification as a human

14  factors expert, Dr. Vredenburgh has a Ph.D and master's degree in industrial organizational

15  psychology.  She consults with various businesses, primarily in the field of warnings,

16  human factors, and safety.  Thus, Dr. Vredenburgh is certainly qualified to testify about

17  the general "hazard control hierarchy" that she refers to in her report.  (Doc. 130-1 at 5.)

18          Nevertheless, she has no background in mechanical engineering and Plaintiffs have

19  failed to show that she is qualified to testify about a specific design defect in the DuraPack

20  5000.  Dr. Vredenburgh's design opinions have previously been excluded as "outside her

21  expertise."  *See Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107, 2009 WL 7452756, at

22  *13 (S.D. Cal. July 28, 2009) (finding that Dr. Vredenburgh did not have sufficient

23  engineering expertise to opine on design defect of a gas cylinder).  In this case, too, she has

24  failed to demonstrate sufficient expertise to speak to the design of the refuse machine.

25          Additionally, Dr. Vredenburgh's design opinions, to the extent she offers such

26  opinions, are not relevant or reliable.  Her opinion that the DuraPack 5000 "forces the

27  operator to be inches from the hazard, path of ejections, due to the design/placement of the

28  controls," merely identifies the location of the packer panel controls relative to the opening

of the garbage truck.  She does not use that observation as a point of departure for any theory, test, or conclusion that is verified, reviewed, accepted or testable.  Under Rule 702, it is "the expert's scientific, technical, or other specialized knowledge" that must help the trier of fact "understand the evidence or . . . determine a fact in issue."  *Marsteller v. MD Helicopter Inc.*, No. CV-14-01788, 2018 WL 3023285, at *1 (D. Ariz. May 21, 2018).  This design opinion does not rely on Dr. Vredenburgh's expert or specialized knowledge as it is simply an observation about the location of the controls that a lay witness could make.  The opinion also does not help the jury understand the evidence or determine a fact at issue because the mere identification of the location controls does not speak to whether the product design is unreasonably dangerous.  Because "the Court does not want the jury to assign inappropriate weight and credibility" to such an expert opinion, it is excluded. *United States v. Losch*, -- F. Supp. 3d --, 2022 WL 1540166, at *3 (D. Ariz. 2022).

To the extent Dr. Vredenburgh's opinion does attempt to identify a more specific design flaw, it is not reliable.  Her identification that the controls are near a potential hazard, while perhaps logical, is not based on reliable testing, peer reviewed, or generally accepted in the scientific community.  Dr. Vredenburgh's expert report ultimately "offer[s] nothing more than a series of conclusions regarding the safety of the [machine's] current design, unaccompanied by any reasoning or explanation."  *Rodriguez v. JLG Indus.*, No. CV 11-04586, 2012 WL 12883784, at *9 (C.D. Cal. Aug. 3, 2012).  Dr. Vredenburgh does not explain how she reliably applied principles accepted in her field to reach this conclusion.  And, her design opinion, like Dr. Glancey's, runs counter to the American National Standards Institute's ("ANSI") standard governing refuse trucks, which requires hopper controls on refuse trucks to be located on the side of the vehicle, positioned so that "the operator has a clear view of the point of operation."  (Doc. 132-3 at 118.)  Additionally, the only testing that Dr. Vredenburgh offers is her "surrogate study," in which she demonstrates that if a person is standing at the controls, a twelve-foot-long stick may extend to reach the person's head.  She does not indicate that this type of testing is commonly used in the field or rests on any peer reviewed method to assess design defects.

1   Further, Dr. Vredenburgh concedes that does not opine on specific design remedies in her

2   report.   As a result, she may not testify about design defects in the DuraPack 5000.

3   Defendant's motion is granted as to her design opinions, except for the general "hazard

4   control hierarchy" concept.

5       **C. Dr. Hayes**

6           Dr. Hayes's opinion that the DuraPack 5000 was defectively designed is excluded.

7   Ultimately, Plaintiffs do not contest that Dr. Hayes was not retained to offer an independent

8   opinion that the DuraPack 5000 was defectively designed.  (Doc. 147 at 2.)  Instead, they

9   assert that he will testify on causation issues at trial.  Plaintiffs do not offer evidence to

10  demonstrate that Dr. Hayes has the requisite qualifications to testify about the design of a

11  refuse machine.  Additionally, his opinion that the machine contained a design defect is

12  entirely unsupported by any testing or research; it merely repeats Dr. Glancey's conclusion.

13  And at his deposition, Dr. Hayes conceded that he had not evaluated whether any

14  alternative designs would have prevented the release of stored energy in the branch.  (Doc.

15  128-1 at 21.)  Dr. Hayes will therefore be precluded from testifying that it is his expert

16  opinion that the DuraPack 5000 was defectively designed.

17                      **Remaining Motions to Exclude**

18          As the following section shows, the remaining motions to exclude are immaterial to

19  the Court's outcome on the summary judgment motion.  That is, even if resolved in the

20  Plaintiffs' favor, the motions would not change the ultimate disposition of the case.  As

21  such, the Court need not rule on the merits of the motions to exclude the remaining expert

22  opinions or any motions to exclude supplemental disclosures.

23  **II.     Motion for Summary Judgment**

24          Defendant moves for summary judgment on all of Plaintiffs' claims.  The purpose

25  of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*

26  *Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is appropriate if the

27  evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

28  no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010).  "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.*  As the Ninth Circuit has said, "[t]his burden is not a light one." *Id.*  To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*  Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

**A.  Strict Products Liability**

Plaintiffs first bring a claim for strict products liability.  To prevail on a strict products liability claim, Plaintiffs must demonstrate that a product was in a defective and unreasonably dangerous condition at the time it left Defendant's control, and that the defective condition was the proximate cause of the Plaintiff's injury. *Gosewisch v. Am. Honor Motor Co.*, 737 P.2d 376, 379 (Ariz. 1987).  In Arizona, there are three theories under which a Plaintiff can bring a claim: (1) design defects, (2) informational defects, or (3) manufacturing defects.  The Court addresses each of the Plaintiffs' theories in turn.

### 1.  Design Defect

Plaintiffs do not meet their burden under Rule 56 to establish a genuine issue for trial about a design defect.  A federal court applies state law when determining a products liability claim.  *St. Clair v. Nellcor Puritan Bennett LLC*, No. CV-10-1275, 2011 WL 5331674, at *4 (D. Ariz. Nov. 7, 2011).  To establish that there was a design defect, Plaintiffs must show that "the product is defective and unreasonably dangerous; the defective condition existed at the time it left defendant's control; and the defective condition is the proximate cause of the plaintiff's injuries."  *Walsh v. LG Chem Am.*, No. CV-18-01545, 2021 WL 5177864, at *2 (D. Ariz. Nov. 8, 2021).

Plaintiffs provide three allegedly disputed material facts to argue the claim should survive summary judgment: (1) where Mr. Clayton was standing when he was struck, (2) the position of Mr. Clayton's head, and (3) how the branch that struck Mr. Clayton was ejected from the hopper.  (Doc. 152 at 6.)  As to the third of the allegedly disputed facts, however, Plaintiffs do not assert that the branch was ejected from the hopper by the operation of the packer panels.  Plaintiffs emphasize that "[w]hether the packer panels were moving is completely irrelevant to the focus of Plaintiffs' claims." (Doc. 143 at 2.)  Thus, the first fact is not disputed on the summary judgment motion.  As to the first and second facts, they may be disputed, but they are not material.  That is, even if the facts were resolved entirely in the Plaintiffs' favor, there is still not enough evidence in the record to establish that the design was unreasonably dangerous or that the defect proximately caused Mr. Clayton's injury.  Thus, for the purposes of this motion, the Court will accept Plaintiffs' version of these facts as true when evaluating unreasonable danger and proximate causation.

#### i.  Unreasonable Danger

Plaintiffs appear to advance two potential theories for a specific design defect.  The first is that the mere opportunity for debris to escape from the hopper is in itself a design defect.  The second is that the placement of the controls constituted a design defect because it required an operator to stand in a hazardous position.  Plaintiffs have not produced

1  evidence on either theory from which a jury could reasonably render a verdict in their favor.

2  *In re Oracle Corp.*, 627 F.3d at 387.

3          In Arizona, there are two possible tests to determine if a product is unreasonably

4  dangerous.  Under the consumer expectation test, "the fact-finder determines whether the

5  product 'failed to perform as safely as an ordinary consumer would expect when used in

6  an intended or reasonable manner.' If so, the product was in a defective condition and

7  unreasonably dangerous."  *Golonka v. General Motors Corp.*, 65 P.3d 956, 962 (Ariz.

8  2003) (citations omitted).  Under the risk-benefit test, the fact-finder is asked to determine

9  "in light of relevant factors, whether 'the benefits of [a] challenged design . . . outweigh

10  the risk of danger inherent in [the] design.'"[1]  *Id.*  Arizona courts have held that while the

11  "consumer expectation test works well in manufacturing defect cases . . . [i]n design defect

12  cases, however, the consumer expectation test has limited utility."  *Id.*  "Consequently,

13  when application of the consumer expectation test is unfeasible or uncertain, in design

14  defect cases, courts additionally or alternatively employ the risk/benefit analysis to

15  determine whether a design is defective and unreasonably dangerous."  *Id.*

16          First, the Plaintiffs do not adequately support the theory that the mere opportunity

17  for debris to escape the refuse truck constituted an unreasonable danger.  Courts are clear

18  that "strict liability is not synonymous with absolute liability."  *Vineyard*, 581 P.2d at 1154.

19  In other words, the existence of a hazard or availability of a safety mechanism do not,

20  without more, make a product unreasonably dangerous.  Because "[a] manufacturer has no

21  duty to make a product which incorporates only the ultimate in safety features," the mere

22  ability of a product to cause injury cannot be sufficient to render it unreasonably dangerous.

23  *Raschke v. Carrier Corp*, 703 P.2d 556, 558 (Ariz. Ct. App. 1985).  Thus, in this case, the

24  general ability for refuse to escape the hopper is not sufficient in itself to constitute an

25  unreasonable danger.  Plaintiffs offer no evidence demonstrating whether it is feasible to

26  ─────────────
[1] The relevant factors are non-exhaustive and include: the usefulness and desirability of the
27  product, the availability of other and safer products to meet the same need, the likelihood
of injury and its probable seriousness, the obviousness of the danger, common knowledge
28  and public expectation of the danger, the avoidability of injury by care in use of the product,
and the ability to eliminate the danger without seriously impairing the usefulness of the
product.  *Golonka*, 65 P.3d at 962.

create a refuse machine that eliminates the possibility of ejecting debris.  Further, they offer no evidence of the costs, risks, or benefits associated with eliminating this possibility. Importantly, the primary function of the DuraPack 5000 is to collect refuse.  By necessity, the machine must contain an opening or an area for the refuse to be placed; and an opening can create a possibility that the items within could escape.  However, without any evidence as to how to prevent such a possibility while retaining the function of the machine, no reasonable jury could find that the fact that debris could be ejected from the hopper makes the product unreasonably dangerous.

The second theory Plaintiffs raise is that the placement of the controls is unreasonably dangerous because it exposes the operator to flying debris.  Plaintiffs do not offer sufficient evidence to support this theory either.  In the absence of any expert who can offer admissible testimony about a design defect, there is scant evidence in the record as to whether the placement of the controls is unreasonably dangerous.  To be sure, "there is no requirement under Arizona law that expert testimony be given in a products liability action."  *Martinez v. Terex Corp.*, 241 F.R.D. 631, 641 (D. Ariz. 2007).   And, "Plaintiffs . . . must be permitted to rely upon circumstantial evidence alone in strict liability cases."  *Dietz*, 685 P.2d at 747.  Yet, the circumstantial evidence must actually permit the jury to conclude that the product was unreasonably dangerous and that the defect caused Mr. Clayton's injury.

To support the argument that the location of the controls is unreasonably dangerous, Plaintiffs argue that numerous safer alternatives were available to Heil.  Having excluded Plaintiffs' expert testimony about safer alternative designs, the Court finds no evidence in the record to support that assertion.  Plaintiffs do not offer evidence that the controls should be placed elsewhere on the machine.  The only alternative design they offer is adding a guard or a "view port" to the existing DuraPack 5000.  Even if the Plaintiffs' alternative designs were admissible without an expert, their existence alone does not establish that the product was unreasonably dangerous.

Defendant relies on cases that are illustrative of this point.  First, in *Raschke v.*

*Carrier Corp.*, the plaintiffs alleged that the furnaces in their homes had a design defect because they did not contain a sensing mechanism that would automatically shut them off in the event there was an excess of carbon monoxide in the room.  703 P.2d 556, 558 (Ariz. Ct. App. 1985).  There was, however, no evidence that such a device existed, and the court emphasized that "[a] manufacturer has no duty to make a product which incorporates only the ultimate in safety features."  *Id.*  The court reached this holding even in light of testimony that "it was technologically possible to provide for a sensing mechanism that would warn of danger."  *Id.*  The same is true in this case; even if Plaintiffs' evidence of safer alternative designs were admissible, their mere existence does not establish that the current design is unreasonably dangerous.

Courts also consider the likelihood of injury in assessing whether an alternative design indicates that the current design is unreasonably dangerous.  In *Vineyard v. Empire Machinery Co.*, the court considered whether a lack of rollover bars on a piece of heavy equipment constituted a design defect.  581 P.2d 1152, 1155 (Ariz. Ct. App. 1978).  The court emphasized that because the only danger presented by a lack of such bars was if the equipment should turn over and because that chance was "slight," it was not "a danger 'to an extent beyond that which would be contemplated by the ordinary consumer.'"  *Id.*  Because the machine did not have such a propensity to turn over, even a slight risk was not sufficient to render the design unreasonably dangerous.  Here, Plaintiffs similarly fail to allege that the DuraPack 5000 had a propensity to eject debris in the manner that caused Mr. Clayton's injury.

Plaintiffs attempt to differentiate their case by alleging that Heil knew for decades that flying debris had struck people after being ejected from their refuse machines.  In a strict liability claim, however, the Court does not assess the reasonableness of the Defendant's conduct in light of its knowledge.  *Golonka*, 65 P.3d at 963; *Gomulka v. Yavapai Machine & Auto Parts, Inc.*, 745 P.2d 986, 989 (Ariz. Ct. App. 1987) ("A negligent design case focuses on whether the defendant's conduct was reasonable in view of a foreseeable risk at the time of design of the product.  A strict liability design defect

case . . . focuses on the quality of the product."). Thus, previous incidents are only relevant insofar as they shed light on the inherent dangerousness of the product. Here, Plaintiffs point to two cases in which Heil was previously a Defendant to show that the product was unreasonably dangerous. It appears that the prior incidents involved different machines, and in at least one of those incidents, the actual compaction of the packer panels caused refuse to be ejected, supporting "the reasonable inference that the unit malfunctioned during normal, expected operation." *Jones v. Heil Co.*, 566 So.2d 565, 567 (Fla. Ct. App. 1990). The fact that the packer panels on different models of Heil's trucks ejected debris on only two occasions over the course of several decades does not demonstrate that the DuraPack 5000 had a propensity to eject spring-loaded debris when no one asserts that the operation of the packer panels played a role in the ejection here. These prior incidents, therefore, are not sufficient circumstantial evidence to show the design was unreasonably dangerous.

The lack of evidence to support unreasonable danger shows that a reasonable jury could not find for Plaintiffs on this element. Plaintiffs do not identify a hazardous zone that the location of the controls creates, they do not assess the risks and benefits of relocating the controls, and they do not establish that the existence of a safety feature such as guarding, or a viewing port makes the current design unreasonably dangerous. As such, they cannot show that the product contained a design defect.

### ii. Proximate Causation

There is an equally scant amount of admissible evidence in the record to support causation. "Determining proximate cause typically is a question of fact for the jury." *Bailey v. Ethicon Inc.*, No. CV-20-00457, 2021 WL 4844393, at *8 (D. Ariz. July 13, 2021). The Plaintiffs must, however, "present sufficient evidence from which a juror could determine that causation is 'probable' not 'merely possible.'" *Id.* Plaintiffs assert that the evidence supports proximate causation because (1) Mr. Clayton was operating the packer panel controls at the time of the incident, and (2) the experts establish proximate causation. (Doc. 143 at 9.) They rely almost entirely on the experts' testimony to establish proximate

causation.  (*Id.*)  Having excluded the experts' design defect testimony, the Court looks elsewhere for evidence of proximate causation.  Plaintiffs argue that the fact the controls were at the rear of the hopper and Mr. Clayton was standing at the controls supports a finding of proximate cause.  This assertion is insufficient, even if the facts prove to be true. The proximate cause inquiry is not whether the product caused the injury, but whether the element of the design that is defective caused the injury.  *Bailey*, 2021 WL 4844393, at *9-10.

As noted above, Plaintiffs do not allege that the movement of the packer panels caused the ejection of the branches.  Instead, they allege that because Mr. Clayton had to stand near enough to the hopper that a branch could reach him if ejected, the design defect caused his injury.  Even if Plaintiffs could produce admissible evidence that some garbage trucks have modifications such as a grate or a guard next to the controls, they have no evidence to demonstrate such modifications would have prevented this injury.  They provide no evidence about how the trajectory of the branch could have changed if the truck contained guards and no evidence that any of their proposed modifications (if admissible) could or would have stopped the "2,500 lbs of force" with which the branch struck Mr. Clayton.  (Doc. 128-1 at 90.)

Plaintiffs' argument that a design defect proximately caused Mr. Clayton's injury is further weakened by the fact that Mr. Loburi recognized the branches were twice the maximum length that should be loaded into the hopper.  Plaintiffs do not appear to challenge the fact that the branches were released due to the "stored . . . spring-loaded energy" of the branches longer than 6 feet.  (Doc. 132-3 at 106.)  They also do not rebut Defendant's evidence that "any limbs shorter than 6 feet long could not have stored" such energy to eject the branch with such force.  (*Id.*)  Thus, the unfortunate fact that Mr. Clayton got injured while standing near the controls does not establish causation.  To find otherwise would violate the principle that "strict liability is not synonymous with absolute liability." *Vineyard*, 581 P.2d at 1154.  A reasonable jury could not find that a design defect in the DuraPack 5000 was the proximate cause of Mr. Clayton's injury.

For the above reasons, Defendant's Motion for Summary Judgment is granted as to the design defect theory.

## 2. Information Defect

Plaintiffs do not provide sufficient evidence to support an information defect claim beyond summary judgment. "A prima facie case of strict liability for informational defect requires a plaintiff to show (1) that the defendant had a duty to warn, (2) that the missing warning made the product defective and unreasonably dangerous, (3) that the warnings were absent when the product left defendant's control, and (4) that the failure to warn caused plaintiff's injury." *Baca*, 2020 WL 6450294, at *3.

### i. Unreasonable Danger

In this case, the information defect claim hinges almost entirely on Plaintiffs' design defect claim. Plaintiffs ultimately allege that no warning would have been adequate to prevent Mr. Clayton's injury because of the inherently flawed design of the DuraPack 5000.[2] In other words, because the design places an operator in an inherently hazardous location, no warning could possibly alleviate the hazard. Even if this allegation is true, it fails to form an information defect claim as a matter of law because Plaintiffs do not demonstrate that the missing warning makes the product defective and unreasonably dangerous. To show that a warning makes a product unreasonably dangerous, a plaintiff must show that "the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings . . . and the omission of the instructions or warnings renders the product not reasonably safe." *Powers v. Taser Int'l*, 174 P.3d 777, 782 (Ariz. Ct. App. 2007) (quoting Restatement (Third) of

---

[2] Plaintiffs' position on this point has fluctuated over time. Defendant's Motion for Summary Judgment argued that Plaintiffs cannot bring an information defect claim with testimony that the hazard at issue cannot or should not be addressed through a warning. (Doc. 131 at 16.) In response, Plaintiffs argued that Defendant mischaracterized their expert opinion, and that their position was simply the "least effective option" in this case. (Doc. 143 at 16.) Nevertheless, at oral argument, Plaintiffs did argue that even if Heil had warned Mr. Clayton about the specific hazard of flying debris, it would not have mattered because of the design of the garbage truck. (Oral Arg. Tr. 36:10-17) ("[O]ur experts . . . will say there is no adequate warning. . . .Even if [the warning] did [specifically warn of the risk], it didn't matter because in order to operate the garbage truck you had to be there. You couldn't operate the garbage truck and not subject yourself to the hazard.")

1   Torts: Products Liability § 2(c) (Am. L. Inst. 1998)).

2          Plaintiffs' argument precludes a finding in their favor on this element.  They do not

3   propose an alternate warning that would have made the DuraPack 5000 reasonably safe or

4   identify what language or features a proper warning might have included.  While Plaintiffs

5   are not required to identify an alternate sufficient warning to prevail on their claim, here

6   they do not make the initial showing that the existing warnings are insufficient.  *See, e.g.*,

7   *Tucson Indus. v. Schwartz*, 501 P.2d 936, 940 (Ariz. 1972) (finding that a warning that

8   vapors were harmful and toxic was insufficient because an adequate warning would have

9   warned that the fumes could cause blindness).  Their warnings expert, Dr. Vredenburgh,

10  opines that "the existing warnings did not have enough information to prevent the users

11  from being positioned at the controls viewing the compaction process." (Doc. 130-1 at 7.)

12  In her rebuttal report, however, she opines "the design is in conflict with the warnings" and

13  "[t]o make it possible to follow the warnings and place the operator in a safe location,

14  several design modifications could have been implemented."  (Doc. 145-1 at 9.)  She

15  testified at her deposition: "I don't propose a change in label. I propose the hazard be

16  addressed at a higher level. I don't see how the existing design that there is a good warning

17  that protects users in and of itself, without making higher level changes." (Doc. 132-3 at

18  82.)

19         Thus, Plaintiffs do not put forth evidence that sufficient warnings, in and of

20  themselves, could have reduced or avoided the risks associated with the DuraPack 5000.

21  To the contrary, they argue that for any warning to be sufficient, the *design* of the product

22  must change.  At its core, the Plaintiffs' information defect claim simply repackages their

23  design defect claim.  Moreover, even if Plaintiffs could rely wholly on the unreasonable

24  danger of the design to advance a warnings defect claim, here the Court does not find

25  sufficient evidence to conclude that the DuraPack 5000 contains a design defect.  As such,

26  Plaintiffs cannot show that inadequate warnings made the product unreasonably dangerous.

27         **ii.  Proximate Causation**

28         For the same reasons as discussed above, in limiting their warning argument to the

assertion that no warning was sufficient to prevent the accident, Plaintiffs have, of necessity, forfeited the argument that an inadequate warning was a proximate cause of the accident.  "To establish proximate cause in a failure-to-warn or inadequate warning case, a plaintiff must provide 'evidence that had a proper warning been given, he would not have used the product in the manner which resulted in his injury, or by evidence that certain precautions would have been taken that would have avoided the accident.'"  *Walsh v. LG Chem Am.*, 2021 WL 5177864, at *5 (quoting *Gosewisch*, 737 P.2d at 379).  Plaintiffs' very argument forecloses such a showing.

In arguing for proximate cause, Plaintiffs assert that "Heil gave only vague and poorly worded warnings."  (Doc. 143 at 16.)  They do not, however, offer any evidence that an adequate alternative warning would have changed Mr. Clayton's use of the product or caused him to take some precaution that could have avoided the accident.  To the contrary, they argue that "Heil should have pursued [design] methods first before relying solely on warnings to protect users."  (Doc. 143 at 16.)  As noted above, this argument speaks entirely to alleged design flaws, not the proximate cause of a warnings defect.  If Heil could not have made a proper warning without changing the product's design, then by default, no proper warning could have prevented Mr. Clayton's injuries.  As a result, Plaintiffs are unable to prove that an information defect was the proximate cause of Mr. Clayton's injuries.  Thus, summary judgment is granted on the information defect theory.

### 3.  Manufacturing Defect

Plaintiffs do not offer evidence of a manufacturing defect.  To prove a manufacturing defect, a plaintiff "must identify or explain how the product either deviated from the manufacturer's intended result or how the product deviated from other seemingly identical models."  *Baca v. Johnson & Johnson*, No. CV-20-01036, 2020 WL 6450294, at *2 (D. Ariz. Nov. 2, 2020).  Plaintiffs offer no such evidence and do not appear to dispute Defendant's summary judgment motion on this ground.  Absent any evidence of a factual dispute regarding a manufacturing defect, the Defendant's motion for summary judgment is granted as to the manufacturing defect theory.

**B. Negligence**

Plaintiffs' second claim is for negligence.  "If [a plaintiff] cannot prove his case in strict liability, he cannot prove it in negligence either.  This is true because if [the plaintiff] were to proceed on a negligence theory he would have to prove everything he would need to prove under a strict liability theory plus he would have to prove that the defendant knew or should have known that [the product] was unnecessarily dangerous."  *Gomulka*, 745 P.2d at 990.  Because the Court finds that Plaintiffs do not offer sufficient evidence to succeed under any strict liability theory in this case, Plaintiffs cannot succeed on a negligence claim either.

**CONCLUSION**

Because a finding in the Plaintiffs' favor on the remaining motions would not alter the Court's outcome on summary judgment, it need not rule on the merits of the motions.

Accordingly,

**IT IS THEREFORE ORDERED** Defendant's Motion for Summary Judgment (Doc. 131) is **GRANTED** on all claims.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Untimely Supplemental Expert Disclosures (Doc. 123) is denied as moot.

**IT IS FURTHER ORDERED** that Defendant's Supplemental Motion to Exclude Additional Untimely Expert Disclosures (Doc. 125) is denied as moot.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Testimony of Wilson Hayes (Doc. 128) is **GRANTED** in part and **DENIED** in part.  It is granted as to his design defect opinions. The remainder of the Motion is denied as moot.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Testimony of James Glancey (Doc. 129) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude the Testimony of Alison Vredenburgh (Doc. 130) is **GRANTED** in part and **DENIED** in part.  It is granted as to her design defect opinions. The remainder of the Motion is denied as moot.

1    **IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment and

2    terminate this matter accordingly.

3    Dated this 2nd day of December, 2022.

G. Murray Snow
Chief United States District Judge